# United States District Court
# Central District of California
# Western Division

| | |
|---|---|
| BENCHMARK INSURANCE CO., <br>     Plaintiff, <br>   v. <br> DISMON CORP., *et al.*, <br>     Defendants. | CV 15-01539 TJH (FFMx) <br><br> **Amended Order and Judgment** <br><br> JS-6 |

The Court has considered Plaintiff's motion for summary judgment or, alternatively, an order pursuant to Fed. R. Civ. P. 56(g) regarding the material facts not in dispute, together with the moving and opposing papers.

Plaintiff Benchmark Insurance Company ["Benchmark"] issued insurance policies to Defendant Dismon Corp. ["Dismon"], a construction company wholly owned and operated by its president, Jaafar Ramin Jaafarian, between 2009 and 2012: Policy No. BIC5002341, in effect from May 16, 2009 to May 16, 2010 ["2009 Policy"]; Policy No. BIC5003424, in effect from June 13, 2010 to June 13, 2011 ["2010 Policy"];

Policy No. BIC5004981, in effect from June 13, 2011 to June 13, 2012 ["2011 Policy"]; and Policy No. BIC5006472, in effect from June 13, 2012 to June 13, 2013 ["2012 Policy"] [the 2009, 2010, 2011, and 2012 Policies collectively referred to as "The Policies," and the 2010, 2011, and 2012 Policies collectively referred to as the "2010–12 Policies,"].

The Policies were underwritten by Westcap Insurance Services, LLC ["Westcap"]. Dismon retained an insurance broker, Concord General Insurance Services ["Concord"] to procure The Policies and the 2009 Policy. CK Specialty Insurance Associates, Inc. ["CK Specialty"], at the times relevant to this motion, was an independent wholesale insurance broker.

On February 3, 2009, Westcap received from CK Specialty a Contractors Application identifying Dismon as the applicant and which included the following questions and answers to questions sixty-seven through seventy-one of the application ["Subject Application Questions"] :

- "Does applicant have a written contract with its subcontractors which includes a hold harmless agreement relative to work performed by the subcontractor?"
- "Are you named as an additional insured on your subcontractors' policies?"
- "Does applicant hold others harmless and/or are you required to provide additional insured endorsements for others?"
- "Are your subcontractors required to provide you with a certificate of insurance before commencing work?"
- "Does applicant require subcontractors who do work for the applicant to maintain limits of liability at least $1,000,000 per occurrence?"

On May 12, 2009, Jaafarian executed the Contractors Application ["2009 Application"] on behalf of Dismon and transmitted the signature page to Concord. On June 2, 2009, CK Specialty sent an email to Westcap transmitting the Concord fax

cover sheet with the Contractors Application bearing a signature on behalf of Dismon, dated June 2, 2009. Subsequently, Benchmark issued the 2009 Policy.

On May 20, 2010, Dismon applied for commercial general liability insurance ["2010 Application"]. The 2010 Application answered each of the Subject Application Questions in the affirmative. Jaafarian, on behalf of Dismon, signed the 2010 Application. Subsequently, Benchmark issued the 2010 Policy.

On June 13, 2011, Jaafarian requested a renewal of the 2010 Policy. Thereafter, Concord submitted Dismon's application for renewal ["2011 Application"], signed by Jaafarian, in which the Subject Application Questions were answered in the affirmative. Subsequently, Benchmark issued the 2011 Policy.

On June 22, 2012, Jaafarian requested a renewal of the 2010 Policy. Thereafter, Concord submitted Dismon's application for renewal ["2012 Application"], signed by Jaafarian, in which the Subject Application Questions were answered in the affirmative. Subsequently, Benchmark issued the 2012 Policy.

At all relevant times in this matter: Dismon did not have written contracts with all of its subcontractors; Dismon had not been named as an additional insured on all of its subcontractors' policies; and Dismon had not required all of its subcontractors to provide Dismon with a certificate of insurance before commencing work.

The Policies were issued with an endorsement entitled "Subcontractor Special Conditions" ["Subcontractor Endorsement"] stating that ""a condition precedent to this policy applying to any claim in whole or in part based upon work performed by subcontractors" is that the insured must "have, prior to the date of the loss giving rise to the claim": (1) "received a written indemnity agreement from the subcontractor holding" the insured "harmless for all liabilities, including costs of defense, arising from the work of the subcontractor"; (2) "obtained certificates of insurance from the subcontractor indicating that" the insured is "named as an additional insured on a policy providing coverage at least as broad as the coverage provided by this policy . . ."; and (3) the insured has "maintained the records evidencing compliance with subsections 1

and 2."

On June 22 2009, Accurate Inspection Services, retained by Westcap, conducted an inspection of the 2009 Policy ["June 22, 2009, Inspection"]. The inspection was conducted via a telephone survey with Jaafarian. In its report on the June 22, 2009, Inspection [the "Inspection Report"], Accurate Inspection Services noted that Dismon answered "[n]o" to the question "[d]o you have "Hold Harmless Clause" signed?" The Inspection Report, also, notes that Dismon did not have "contracting jobs during [the] 2008 policy year, [Dismon] . . . provided consulting services only." The Inspection Report, further, noted that Dismon "anticipate[d] 100% new construction" in 2009.

Defendants Masoud Tehrani and Fatemeh Tehrani own — Defendant Tara Tehrani resides at — a residential property ["Residence"]. On March 16, 2009, Masoud Tehrani and Dismon entered into a contract for the construction of the Residence. On June 10, 2014, Tara Tehrani submitted a claim for damage to the Residence to Benchmark ["Tehrani Claim"]. She claimed, *inter alia*, that Dismon failed to properly construct and supervise the construction of the Residence. As a result, she claimed, the Residence suffered from water damage, including mold and fungus growth under the home, and loss of use.

On behalf of Benchmark, Westcap issued letters to Defendants dated July 15, 2014 and July 24, 2014 in connection with the Tehrani Claim. Both letters included the notice that "Benchmark will conduct an investigation in this matter subject to a reservation of rights and in doing so is not waiving but is preserving all its rights to contend that it is not obligated to provide coverage for Dismon Corporation and to file a declaratory relief action to secure a resolution of any coverage issues should Benchmark so elect." On April 17, 2015, Masoud and Fatemeh Tehrani filed an action entitled *Masoud H. Tehrani and Fatemeh A. Tehrani v. Dismon Corp., et al.*, Los Angeles County Superior Court, Torrance Courthouse, Southwest Judicial District, Case No. YCO70534, against Dismon, Jaafarian, and others, including fourteen of Dismon's subcontractors, seeking damages based on alleged negligent construction of

the Residence and other claims for relief [the "*Tehrani* Action"].

On March 3, 2015, Benchmark filed the Complaint in the instant matter. The Complaint asserted claims for rescission and declaratory relief, and offered "to repay Dismon a sum equal to all premiums received for the Policies and return the parties to a position *status quo ante*." On April 22, 2016, Benchmark moved for partial summary judgment as to the two declaratory relief claims.

On August 9, 2016, this Court denied Benchmark's April 22, 2016, motion for partial summary judgment. The Court identified two defects. First, the Court found that the evidence did not establish beyond controversy that Dismon received The Policies or was given notice of the existence of the conditions precedent. The April 22, 2016, motion for partial summary judgment supported that allegation with a declaration from the president of Westcap stating that pursuant to Westcap's operating procedures, Westcap would have sent copies of The Polices to Dismon via two intermediaries. According to O'Neil, Westcap would have sent copies of The Policies to CK Specialty, which, in turn, would have sent the policies to Concord, which, in turn would have sent The Policies to Dismon. Further, Benchmark argued that the Subject Application Question themselves provided sufficient notice as to the existence of the conditions precedent.

By contrast, the instant motion for summary judgment sufficiently establishes that The Policies were delivered to Dismon. The evidence establishes that Westcap sent each of The Policies to Concord with the intent that each policy be effective. Thus, Plaintiff has established that The Policies were delivered because "where the insurer mails the policy to its agent, the intent with which this act is performed governs in determining the sufficiency of delivery." *See Golden Eagle Ins. Co. v. Foremost Ins. Co.*, 20 Cal. App. 4th 1372, 1388 (1993) (alteration omitted).

Second, with respect to the April 22, 2016, motion for partial summary judgment as to the declaratory relief claim regarding Benchmark's duty to defend, the Court held, *inter alia*, that Benchmark had not established that it did not have a duty to defend

because it did not show that there is an absence of any potential for coverage. *See Montrose Chemical Corp. v. Superior Court*, 6 Cal. 4th 287, 295 (1993). As discussed below, this defect remains as to the 2009 Policy but not as to the 2010–12 Policies.

Plaintiff, now, moves for summary judgment as to all three of its claims: (1) Rescission of The 2010–12 Policies; (2) Declaratory relief that Benchmark did not have a duty to defend Dismon under The 2010–12 Policies; and (3) Declaratory Relief that Benchmark did not have a duty to indemnify Dismon under the 2009 Policy. In the alternative, Benchmark requests an order pursuant to Fed. R. Civ. P. 56(g) regarding the material facts not in dispute.

To prevail on summary judgment, Benchmark, as the party with the burden of proof and persuasion at trial, has the initial burden to establish, beyond controversy, the essential elements of its claim. *See Southern Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 888 (9th Cir. 2003). Usually, all inferences must be viewed in the light most favorable to non-moving party. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). If Benchmark meets its burden, then the burden shifts to Defendants to show that a triable issue regarding a material fact exists. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–587 (1986).

**Rescission of the 2010, 2011, and 2012 Policies**

Under California law, "[w]hen a policyholder conceals . . . a material fact on an insurance application, the insurer is entitled to rescind the policy." *LA Sound USA, Inc. v. St. Paul Fire & Marine Ins. Co.*, 156 Cal. App. 4th 1259, 1266 (2007). "Materiality is determined solely by the probable and reasonable effect which truthful answers would have had upon the insurer." *LA Sound USA, Inc.*, 156 Cal. App. 4th at 1268. "The fact that the insurer has demanded answers to specific questions in an application for insurance is in itself usually sufficient to establish materiality as a matter of law." *LA Sound USA, Inc.*, 156 Cal. App. 4th at 1268. "Concealment . . . is the neglect to communicate that which a party knows, and ought to communicate . . . ." *LA Sound*

*USA, Inc.*, 156 Cal. App. 4th at 1266 (quotations, alterations, and citations omitted).

Here, Benchmark has established a *prima facie* case for its rescission claim with respect to The 2010–12 Policies. Benchmark has shown, through admissible evidence, that Dismon concealed material facts on its applications for The 2010–12 Policies by answering, through Concord, the Subject Application Questions in the affirmative when those answers were not correct. Moreover, the May 10, 2017, declaration of Timothy W. O'Neill, the President and Underwriting Manager of Westcap during the relevant time period, states that, "Westcap would not have issued" each of The 2010–12 Policies "if Dismon had answered 'NO' to" the Subject Application Questions "or if Westcap had known that Dismon's 'YES' answers to these questions were false." Thus, the burden shifts to Defendants to show that a triable issue regarding a material fact exists. *See Matsushita Elec. Indus. Co.*, 475 U.S. at 586–587.

Dismon and Jaafarian ["D&J"] argue that a triable issue of fact exists with respect to the rescission claim because (1) Benchmark waived its right to rescind The 2010–12 Policies, and (2) the concealed answers to the Subject Application Questions were not material. Neither argument raises a triable issue of fact.

D&J argue that Benchmark waived its right to rescind The 2010–12 Policies for three reasons. "Waiver is the intentional relinquishment of a known right." *LA Sound USA, Inc.*, 156 Cal. App. 4th at 1270. "An insurer does not waive its right to rescind a policy on the ground of false representations if it was unaware of the falsity of those representations." *LA Sound USA, Inc.*, 156 Cal. App. 4th at 1270. "[A]n insurer has the right to rely on the insured's answers to questions in the insurance application without verifying their accuracy." *LA Sound USA, Inc.*, 156 Cal. App. 4th at 1271.

First, D&J point to the Inspection Report, arguing Benchmark waived its right to rescind the 2010–12 Policies because the Inspection Report placed Benchmark on inquiry notice of Dismon's non-compliance with the Subject Application Questions. D&J does not argue that Benchmark had access to any other information indicating that Dismon had concealed information in its applications for the 2010–12 Policies. Thus,

because, *inter alia*, "an insurer has the right to rely on the insured's answers to questions in the insurance application without verifying their accuracy[,]" D&J's first waiver argument fails to raise a triable issue of fact. *See LA Sound USA, Inc.*, 156 Cal. App. 4th at 1271.

Moreover, an insurer's duty to assess the accuracy of an application is generally limited to cases in which such inquiries are reasonable in light of the surrounding circumstances. *See DiPasqua v. California W. States Life Ins. Co.*, 106 Cal. App. 2d 281, 284 (1951). Here, Dismon's indication that it did not have hold harmless agreements related specifically to the 2009 Policy. In light of, *inter alia*, Dismon's duty to communicate "all facts within his knowledge which are or which he believes to be material to the contract[,]" *see* Cal. Ins. Code § 332, with respect to the 2010–12 Policies, Dismon has not sufficiently shown that the inquiry into the 2010–12 Policies based on the information regarding the 2009 Policy would have been reasonable. *See DiPasqua*, 106 Cal. App. 2d at 284.

Second, D&J argue that Benchmark failed to reserve its right to rescind The 2010–12 Policies when it undertook Dismon's defense in the *Tehrani* action. D&J are incorrect. An insurer's failure to reserve rights, without more, generally does not waive the insurer's right to rescind the contract. *See Allstate Ins. Co. v. Golden*, 187 Cal. App. 2d 506, 512 (Ct. App. 1960). Further, an insurer's right to rescind "may be exercised at any time previous to the commencement of an action on the contract." Cal. Ins. Code § 650. Moreover, as noted below, Benchmark gave the required notice to rescind the 2010–12 Policies when it filed the complaint in the instant matter. *See* Cal. Civ. Code § 1691.

Lastly, D&J's argument that the rescission claim is barred by the California Code of Civil Procedure's four-year statute of limitations for rescission actions fails because Benchmark began its investigation of The Policies in 2014; even assuming that the defects in Subject Application Answers for applications for The Policies were discovered in 2014, the Complaint in this action was filed in 2015, therefore falling

within the four-year statute of limitations.

Accordingly, Benchmark has established a *prima facie* case for its rescission claim as to the 2010–12 Policies — Benchmark does not seek, and this Order did not decide, rescission of the 2009 Policy — and Defendants have failed to raise a triable issue of fact as to the rescission claim as to the 2010–12 Policies .

Benchmark, further, has rescinded the 2010–12 Policies. "[T]o effect a rescission a party to the contract must . . . (a) Give notice of rescission to the party as to whom he rescinds; and (b) . . . offer to restore the [the other party everything of value which he has received from him under the contract] upon condition that the other party do likewise . . . ." Cal. Civ. Code § 1691. "[T]he service of a pleading in an action or proceeding that seeks relief based on rescission shall be deemed to be such notice or offer or both." Cal. Civ. Code § 1691. On March 3, 2015, Benchmark filed the Complaint in the instant matter. The Complaint asserted claims for rescission and offered "to repay Dismon a sum equal to all premiums received for the Policies and return the parties to a position *status quo ante*." Consequently, the 2010–12 Policies are void *ab initio*, and Benchmark has no obligation to satisfy any claims made against the 2010–12 Policies. *See LA Sound USA, Inc.*, 156 Cal. App. 4th at 1267.

**Duty to defend and indemnify under the 2010–12 Policies**

As discussed above, Benchmark has no obligation to satisfy any claim against the 2010–12 Policies. *See LA Sound USA, Inc.*, 156 Cal. App. 4th at 1267. Thus, Benchmark's requests for declaratory relief as to the 2010–12 Policies are moot.

**Duty to defend under the 2009 Policy**

The Declaratory Judgment Act provides that "[i]n a case of actual controversy . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration . . . ." 28 U.S.C. § 2201(a). Jurisdiction over a Declaratory Judgment Act claim turns on a two-step test. *See*

*Principal Life Ins. Co. v. Robinson*, 394 F.3d 665, 669 (9th Cir. 2005). First, the Court determines whether there is an actual case or controversy. *Robinson*, 394 F.3d at 669. "[T]he phrase 'case of actual controversy' in the [Declaratory Judgment] Act refers to the type of 'Cases' and 'Controversies' that are justiciable under Article III." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007). Second, if a case or controversy exists, the Court "must decide whether to exercise its jurisdiction by analyzing the factors set out in *Brillhart v. Excess Ins. Co.*, 316 U.S. 491 (1942), and its progeny." *Robinson*, 394 F.3d at 669.

"The *Brillhart* factors are non-exclusive and state that, '. . . the district court should avoid needless determination of state law issues; . . . it should discourage litigants from filing declaratory actions as a means of forum shopping; and . . . it should avoid duplicative litigation.'" *Robinson*, 394 F.3d at 672 (alterations omitted). "Essentially, the district court must balance concerns of judicial administration, comity, and fairness to the litigants." *Robinson*, 394 F.3d at 672 (quotations omitted). Additionally, the Ninth Circuit has noted additional considerations, including:

> "whether the declaratory action will settle all aspects of the controversy; whether the declaratory action will serve a useful purpose in clarifying the legal relations at issue; whether the declaratory action is being sought merely for the purposes of procedural fencing or to obtain a ['*res judicata*'] advantage; or whether the use of a declaratory action will result in entanglement between the federal and state court systems. In addition, the district court might also consider the convenience of the parties, and the availability and relative convenience of other remedies."

*Robinson*, 394 F.3d at 672 (alterations added).

Here, the Court finds that Benchmark's claim for declaratory relief as to its duty to defend Dismon under the 2009 is appropriate for consideration. First, an actual case or controversy exists because, *inter alia*, the *Tehrani* Action called into question whether Benchmark had a duty to defend Dismon. Further, in light of the *Brillhart*

factors, exercising discretion to consider the declaratory relief claim is appropriate because, *inter alia*, the declaratory relief claim as to the 2009 Policy is the only remaining claim and, thus, furthers the Court's interest in judicial economy, and considering it could avoid duplicative litigation relating to the same duty under the 2009 Policy. Thus, the Court will consider Benchmark's declaratory relief claim as to its duty to defend Dismon under the 2009 Policy.

An insurer has a duty to defend if the complaint alleges facts "that create a *potential* for indemnity under the policy." *Scottsdale Ins. Co. v. MV Transp.*, 36 Cal. 4th 643, 654 (2005) (emphasis in original). The duty to defend is broad, and "it is measured by the nature and kinds of risks covered by the policy." *Waller v. Truck Ins. Exch., Inc.*, 11 Cal.4th 1, 19 (1995). Generally, the Court determines "whether the insurer owes a duty to defend . . . by comparing the allegations of the complaint with the terms of the policy." *See Montrose Chem. Corp.*, 6 Cal. 4th at 295. The burden on the insurer is high, and any doubt as to whether a duty to defend was triggered is resolved in favor of the insured. *See Horace Mann Ins. Co. v. Barbara B.*, 4 Cal. 4th 1076, 1081 (1993). "[W]hen the evidence adduced in the declaratory relief action does not permit the court to eliminate the possibility that the insured's conduct falls within the coverage of the policy, the duty to defend is then established, absent additional evidence bearing on the issue." *See Montrose Chem. Corp.*, 6 Cal. 4th at 301 (quotations and alterations omitted).

Here, the Court assesses the 2009 Policy's language by applying "the ordinary rules of contractual interpretation." *Bank of the W. v. Superior Court*, 2 Cal. 4th 1254, 1264 (1992). Thus, "[w]here [the 2009 Policy's language] . . . is clear, the language must be read accordingly." *See Buss v. Superior Court*, 16 Cal. 4th 35, 45 (1997). "Where it is not, it must be read in conformity with what the insurer believed the insured understood thereby at the time of formation." *See Buss*, 16 Cal. 4th at 45. If the 2009 Policy's language remains ambiguous after reading it in conformity with what the insurer believed the insured understood at the time of formation, the ambiguity must

be resolved by interpreting the language "in the sense that satisfies the insured's objectively reasonable expectations[.]" *See Buss*, 16 Cal. 4th at 45.

Benchmark argues that there is no possibility for coverage under the 2009 Policy because, *inter alia*, the Subcontractor Endorsement constitutes a condition precedent to any coverage under the 2009 Policy. The Subcontractor Endorsement provided conditions precedent to coverage for "any claim *in whole or in part* based upon work" completed by subcontractors. (Emphasis added). The placement of the words "in whole or in part," however, renders the Subcontractor Endorsement ambiguous because it is unclear whether the term "in whole or in part" modifies "work" or "claim" in the Subcontractor Endorsement.

The record, however, cures the ambiguity. Reading the ambiguity "in conformity with what the insurer believed the insured understood thereby at the time of formation[,]" *see Buss*, 16 Cal. 4th at 45, resolves the ambiguity because there is evidence in the record establishing that Benchmark believed that Dismon understood the words "in whole or in part" in the Subcontractors Endorsement to exclusively refer to the word "claim." Admitted fact number 24 in the Final Pretrial Conference Order states that Dismon agreed that subcontractors would perform all work on the Residence. Thus, because subcontractors were to perform all work, the term "*or part*" in the Subcontractor Endorsement could only refer to the word "claim." As such, in light of Dismon's failure to satisfy the terms of the Subcontractor Endorsement, the Subcontractor Endorsement precludes Benchmark's duty to defend under the 2009 Policy. In other words, the Subcontractor Endorsement precludes Benchmark's duty to defend because it "eliminate[s] the possibility that the insured's conduct falls within the coverage of the policy[.]" *See Montrose Chem. Corp.*, 6 Cal. 4th at 301. Therefore, Benchmark established a *prima facie* case that it does not have a duty to defend Dismon under the 2009 Policy.

Moreover, Defendants failed to raise a triable issue of fact to defeat summary judgment as to Benchmark's duty to defend under the 2009 Policy.

**Duty to indemnify under the 2009 Policy**

"[W]here there is no duty to defend, there cannot be a duty to indemnify." *Certain Underwriters at Lloyd's of London v. Superior Court*, 24 Cal. 4th 945, 958 (2001) (emphasis omitted). Because, as a matter of law, Benchmark has no duty to defend Dismon in the *Tehrani* Action, Benchmark, also, has no duty to indemnify the Defendants for that suit.

Accordingly,

**It is Ordered** that Benchmark's motion for summary judgment be, and hereby is, **Granted** as to Benchmark's first claim — rescission of the 2010, 2011, and 2012 Policies.

**It is further Ordered, Adjudged and Decreed** that the 2010 Policy, 2011 Policy and 2012 Policy issued by Benchmark to Dismon be, and hereby are, rescinded and are void *ab initio*.

**It is further Ordered, Adjudged and Decreed** that the parties shall be returned to their original positions *status quo ante*, and Dismon shall reimburse Benchmark for all sums paid to defend Dismon and Jaafarian against the Tehrani Claim and the *Tehrani* Action according to proof, offset by the total amount paid by Dismon to Benchmark for premiums for the 2010, 2011 and 2012 Policies.

**It is Further Ordered** that Benchmark's motion for summary judgment be, and hereby is, **Granted** as to Benchmark's second claim — a judicial declaration that it does not have a duty to defend or indemnify under the 2009, 2010, 2011, and/or 2012 Policies.

**It is further Ordered, Adjudged and Declared** that Benchmark does not have a duty to defend or indemnify Dismon under the 2009, 2010, 2011, and/or 2012 Policies.

**It is further Ordered** that Benchmark's request for an order pursuant to Fed. R. Civ. P. 56(g) be, and hereby is, **Denied** as moot.

Date: August 16, 2017

_____
Terry J. Hatter, Jr.
Senior United States District Judge